STATE of South Dakota, Plaintiff and Appellee,

v.

Homer Ignatius CHIEF EAGLE, Defendant and Appellant.

No. 14752.

Considered on Briefs May 23, 1985.

Supreme Court of South Dakota.

Decided Nov. 20, 1985.

appeals from the judgment of conviction entered on these findings. We affirm.

Shortly before going to work at 6:00 p.m., April 25, 1984, Mrs. Jackie Stone parked her automobile, which contained groceries that she had just purchased, in the 100 Block of east Third Street in Winner. She left the car unlocked and the groceries on the front seat.

Upon returning to her automobile after getting off work at 11:00 p.m., Mrs. Stone observed that her car was locked and that an individual, later identified as defendant, was sitting in the back seat eating some of the groceries. Mrs. Stone asked defendant what he was doing in her car, to which defendant replied by waving his hand.

Mrs. Stone called the police. Upon returning to her car, she observed that defendant had left. She observed that the groceries had been scattered throughout the interior of the automobile. She found a glove lying on the seat.

Responding to the call, Winner police officers searched the area and found defendant nearby eating from a can of beans later identified by Mrs. Stone as being of the same brand that she had purchased earlier that day. The officers took defendant to the Winner Police Station. Moments later Mrs. Stone arrived with the glove that she had found in her automobile. Upon observing defendant, Mrs. Stone said, "That's him," to which defendant replied, "I don't know why you are so angry, I got out when I seen you."

The glove found by Mrs. Stone matched a glove found in the possession of defendant at the time he was taken into custody.

John W. Bastian, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Richard F. Rahn of Grieves & Rahn, Winner, for defendant and appellant.

FOSHEIM, Chief Justice.

Defendant was found guilty by a jury of third-degree burglary and was found by the court to be a habitual offender. He

I.

*Ineffective Assistance of Counsel Claim*

Defendant contends that his court-appointed trial counsel (who is not counsel on appeal) provided ineffective assistance by failing to object to Mrs. Stone's testimony regarding her identification of defendant on the ground that the pre-trial confrontation at the police station was so impermissi-

bly suggestive as to deny defendant his right to due process of law.

Although normally we prefer that ineffective assistance of counsel claims be presented by way of post-conviction proceedings, *see, e.g., State v. Tchida,* 347 N.W.2d 338 (S.D.1984), we conclude that we can dispose of defendant's claim on the basis of the record before us.

We analogize the situation in the instant case to those cases in which we have approved on-the-scene identification immediately after the commission of an offense. *See, e.g., State v. Clabaugh,* 346 N.W.2d 448 (S.D.1984); *State v. Bullis,* 255 N.W.2d 290 (S.D.1977); and *State v. Iron Shell,* 86 S.D. 100, 191 N.W.2d 803 (1971).

█ There is nothing in the record to indicate that the police officers planned the confrontation between Mrs. Stone and defendant at the police station. Rather, it appears that Mrs. Stone went there voluntarily to give to the police the glove that she had discovered in her automobile.

█ Moreover, the evidence that it was defendant whom Mrs. Stone saw in her automobile is so overwhelming as to negate any suggestion that he was the victim of a misidentification. Defendant in effect admitted that he was the person whom Mrs. Stone had spoken to. He was found in the immediate vicinity of the automobile eating from a can of beans similar to that purchased by Mrs. Stone. The glove found by Mrs. Stone in the automobile was the mate to that found on defendant's person at the time he was taken to the police station.

█ In the light of these circumstances, we conclude that it is abundantly clear why trial counsel declined to file a pre-trial motion to suppress Mrs. Stone's identification testimony. Trial counsel cannot be faulted for making this decision. Just as counsel has no duty to raise on appeal every issue requested by a defendant, *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), so also counsel need not make pretrial suppression motions that fail on their face. Here, defendant's identity was really not in issue, and his trial counsel wisely chose not to attempt to make it one.

## II.

### *Admission of Prior Convictions*

█ Defendant contends that the trial court erred in admitting evidence of his conviction of two prior felonies.

SDCL 19–14–12 provides that the trial court may admit evidence of prior convictions if it first determines that the probative value of the evidence outweighs its prejudicial effect to the accused. We have held that the record must reveal that the trial court balanced the probative value against the prejudicial effect of such testimony and that the trial court made a finding on the record that the probative value outweighed the prejudice. *See, e.g., State v. Ford,* 328 N.W.2d 263 (S.D.1982), and cases cited therein.

The record reveals that the trial court made a careful analysis of the probative value-prejudicial effect issue and then made a finding that the probative value outweighed the prejudicial effect of the proffered evidence. Given this careful treatment by the trial court, we conclude that there was no abuse of discretion in admitting the evidence, for as we held in *State v. King,* 346 N.W.2d 750, 752 (S.D. 1984), "[A]s long as there is some consideration of the matter and an indication, on the record, that some weighing of factors occurred, no abuse of discretion will be found."

## III.

### *Admission of Evidence Regarding Prior Criminal Acts*

█ Over defense counsel's objection, a Winner police officer was permitted to testify that on May 1, 1983, she had observed defendant get out of a pickup truck on the 100 Block of east Third Street in Winner. As he walked away from the pickup, defendant tossed several hand tools to the ground. When stopped by the officer, defendant had in his hand a flashlight belonging to the owner of the pickup truck.

The state offered this testimony on the ground that it was proper impeachment of defendant's denial on cross-examination that he had ever been in a vehicle other than his own on the 100 Block of Third Street. We conclude that the trial court erred in admitting the testimony for this purpose. SDCL 19–14–10 provides in part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in §§ 19–14–12 to 19–14–16, inclusive, may not be proved by extrinsic evidence." We have held that SDCL 19–14–10 excludes extrinsic evidence of specific acts. *State v. Tribitt*, 327 N.W.2d 132 (S.D.1982), and cases cited therein.

Nor do we believe that the state's evidence of specific prior acts was proper impeachment of defendant's statements made in response to proper cross-examination reasonably suggested by defendant's direct examination. *See United States v. LeAmous*, 754 F.2d 795 (8th Cir.1985).

■ Our review of the evidence persuades us that the error in admitting this evidence was harmless. Defendant contended throughout trial that he was so intoxicated at the time of the offense that he could not have possessed the intent to commit a crime at the time he entered and remained in Mrs. Stone's automobile. The trial court properly instructed the jury on the effect of voluntary intoxication on a defendant's ability to form the intent necessary to commit a crime. Given the totality of the evidence, we are satisfied that absent the erroneously admitted evidence concerning defendant's prior offense, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *See, e.g., High Elk v. State*, 344 N.W.2d 497 (S.D.1984), and cases cited therein.

The judgment of conviction is affirmed.

MORGAN, J., and WUEST, Circuit Judge, acting as a Supreme Court Justice, concur.

HENDERSON, J., dissents.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not participating.

HENDERSON, Justice (dissenting).

In *State v. Tribitt*, 327 N.W.2d 132, 134–35 (S.D.1982), we unanimously held:

Ample authority exists holding that FRE 608(b), the federal counterpart to SDCL 19–14–10, excludes extrinsic evidence of specific acts. *United States v. Powers*, 622 F.2d 317, 324 (8th Cir.1980), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *United States v. Werbrouck*, 589 F.2d 273, 277–78 (7th Cir. 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1978).

In this case, before the jury, the Deputy State's Attorney repeatedly asked questions such as: "In that regard have you ever entered a structure with the purpose of committing a theft or—." Objection sustained. The Deputy State's Attorney then immediately followed it with such a question as: "And in that regard I would ask you have you ever entered a vehicle with the purpose of committing a theft in Winner?" Answer came in (this was all under cross-examination of defendant): "No." An objection by defense counsel was sustained. Continuing with this type of floundering and prejudicial cross-examination, the Deputy State's Attorney asked: "Mr. Chief Eagle, have you ever been involved in some matters that might constitute dishonesty with the Winner Police Department or the Sheriff's Office?" Again, an objection by the defense was sustained. These questions are obviously driving against the force of the federal rule, the state statute, the federal decisions, and our 1982 Supreme Court decision.

The Deputy State's Attorney, however, despite the trial court's previous rulings, continued to attempt, by unlawful means, to put Chief Eagle in a bad light before the jury. The Deputy State's Attorney stumbled on and attempted to lay a foundation for a misdemeanor conviction in Winner, South Dakota, concerning an incident in the 100 block of East Third Street. Due to the

Deputy State's Attorney's questions, which sometimes concerned vacant cars as distinguished from abandoned cars, Chief Eagle, as well as his defense counsel, was confused. The latter objected that the questions were unintelligible. Chief Eagle finally admitted that he knew what vacant meant but when it came to whether or not a car was abandoned, Chief Eagle had great difficulty in answering.

The Deputy State's Attorney was frustrated so a bench conference was asked for and the parties went into the law library for a conference. Lo and behold, the Deputy State's Attorney did an about-face and told the trial judge that she was attempting to impeach the defendant by getting into evidence a 1981 felony conviction. But all of the questions before the jury, immediately preceding the conference, were an attempt to place extrinsic evidence of a specific act before the jury; namely, that Chief Eagle had entered a car in the same 100 block of East Third Street in Winner, South Dakota, and had committed, in so doing, a misdemeanor offense. The Deputy State's Attorney's approach was, therefore, highly improper and the questions themselves, though not allowed, were highly prejudicial to Chief Eagle. Chief Eagle was on trial for a particular entering of a car and was not on trial for entering a car or pickup approximately one year before. The Deputy State's Attorney interjected a collateral issue upon which Chief Eagle was not being tried.

This takes us back to the law library conference. The Deputy State's Attorney then began discussing two felony convictions for receiving stolen property. It then became apparent from the Deputy State's Attorney's own representations that she was unsure of the status of these convictions so she dropped the subject. Then, the discussion reverted to the offered testimony immediately prior to the conference, which concerned a misdemeanor in March 1983 for which Chief Eagle received a 30-day jail sentence; said offense arising out of an offense committed in the 100 block of East Third Street. The Deputy State's Attorney wished to get this misdemeanor con-

viction before the jury, so she represented, to establish "dishonesty." At this conference, however, she was unable to state whether or not it was a state violation or a city ordinance violation. Based upon this sketchy representation and backdrop, defense counsel vigorously objected to any further cross-examination on extrinsic evidence of a specific act such as that which the Deputy State's Attorney was attempting to bring out on cross-examination. The court determined that the two felony convictions, if properly established, could be subjects of cross-examination but not a "prior conviction of petty theft occurring on March 31, 1983." Proceedings then resumed in the courtroom in front of the jury.

One Georgiann Bear, a Winner Police Officer, was called to the stand by the Deputy State's Attorney during the State's rebuttal. As Georgiann Bear was an officer involved in the arrest concerning a misdemeanor on May 1, 1983, defense counsel suspected, prior to her being called, the ploy of the Deputy State's Attorney. Defense counsel, once again in the law library, made a record and objected to Georgiann Bear being called as a witness to testify to the extrinsic evidence of a specific act. Defense counsel further objected on the grounds that he was surprised and had been denied information concerning previous convictions until one day before trial. He also complained that the information which was on the rap sheet was inaccurate and gave the wrong dates and locations and that the Deputy State's Attorney was trying to take advantage of inaccurate information and extrinsic evidence. The Deputy State's Attorney's position was that she was trying to impeach Chief Eagle's testimony concerning his answers to questions which are discussed above. The trial court reversed itself and issued a new ruling, before Georgiann Bear was called, that the extrinsic evidence concerning the misdemeanor could go into evidence. Sensing that he was losing the battle, defense counsel strenuously urged that the court restrict the impeachment to the pre-

mise that "he [Chief Eagle] was in the vehicle in the 100 block of Third Street and that a police officer observed him there." The court ruled, however, that "[w]hatever information relates to his being present there" was admissible. But the court insisted that the conviction itself would be improper "because we have gone into that." The Deputy State's Attorney then proceeded, over strenuous objection, to go into each vivid detail of Chief Eagle sitting in a pickup and thereafter walking away strewing tools but holding onto a flashlight. This is unacceptable, illegitimate, and prejudicial trial practice on the part of the Deputy State's Attorney. It is attempting to persuade by illegitimate means. *See* J. Weinstein & M. Berger, 3 *Weinstein's Evidence*, ¶ 608[05] (1982). Georgiann Bear could not be called as the State's independent witness to establish details of another crime. In other words, all of the specific facts concerning a specific act were deeply delved into, contrary to SDCL 19–14–10, and violative of the precedent established by this Court in State v. Tribitt, 327 N.W.2d 132, and the authorities cited therein. Chief Eagle was thereby tried before a jury on a collateral matter with extrinsic evidence. When the Deputy State's Attorney, because of the trial court's rulings, could not enter the front door by cross-examination of Chief Eagle, she called her own witness to establish the particulars of a misdemeanor. The trial court admitted it, but should not have done so.

I view this as a glaring evidentiary error. The trial court departed from its earlier decision and went far beyond the impeachment of any factual statement made by the confused Chief Eagle in response to confusing questions propounded by the Deputy State's Attorney. Apparently, the majority opinion would essentially agree with my analysis, for even the federal authorities, in the Eighth Circuit Court of Appeals, would agree with what I have composed. *See United States v. LeAmous,* 754 F.2d 795 (8th Cir.1985).

Enter, however, the prosecutor's old friend, the harmless error rule. I disdain how this rule has been used in this Court to sustain convictions when there are glaring errors in the trial court. *See State v. Devine,* 372 N.W.2d 132, 138 (S.D.1985) (Henderson, J., dissenting). We are sprinkling a potion or concocting a remedy in this case and I refuse to accept the bromide. There is prejudicial error here, for, in all probability, this highly damaging evidence concerning a specific incident in the same area had to have produced some effect upon the final result and, indeed, affected the rights of the party, Chief Eagle, assigning this error. *See State v. Devine,* 372 N.W.2d at 141; *K & E Land & Cattle, Inc. v. Mayer,* 330 N.W.2d 529 (S.D.1983); *State v. Rosales,* 302 N.W.2d 804 (S.D.1981); *Matter of M.B.,* 288 N.W.2d 773 (S.D.1980); *Larson v. Locken,* 262 N.W.2d 752 (S.D.1978); *State Highway Comm'n v. Beets,* 88 S.D. 536, 224 N.W.2d 567 (1974); *State v. Reddington,* 80 S.D. 390, 125 N.W.2d 58 (1963); and *State v. Pirkey,* 24 S.D. 533, 124 N.W. 713 (1910).

Chief Eagle was and is a chronic alcoholic, as based on the testimony on file herein, with organic brain damage from alcoholism. He suffers from sclerosis of the liver and is under medical treatment therefor. As a result of spinal tuberculosis, he has had several operations on his spine and is under medication for both the liver and spinal tuberculosis problems. He has had many bouts with delirium tremors and it is medically substantiated that he has alcoholic blackouts. He was born on the Rosebud Indian Reservation and is a Native American. His mother died in childbirth and at age five, his father died of complications of diabetes. He was raised by his grandparents who have since passed on and he is entirely homeless. Chief Eagle drinks two to three quarts of wine a day plus whatever liquor he can get his hands on. On this particular day, he had been drinking wine all day. He washed down 190-proof alcohol with wine and was in a drunken stupor when he entered the vehicle.[1] When the

---

**1.** In *Petersen v. Dep't of Public Safety,* 373 N.W.2d 38, 41–42 (S.D.1985) (Henderson and

owner observed Chief Eagle in the car and asked what he was doing in her car, he simply waved his hand. He left the vehicle shortly thereafter. Testimony also discloses that he has a long-time habit of sleeping in abandoned cars and vehicles in the town of Winner and often sleeps "in the weeds." Officers of the Winner Police Department and the Court Services Department substantiated these facts. Chief Eagle's testimony was that he only wanted to get out of the cold. An Associate Professor of Psychiatry, Dr. Ronald D. Franks, testified on behalf of Chief Eagle. Dr. Franks reviewed the life of Chief Eagle and did a complete evaluation of him. Dr. Franks is a specialist in Forensic Psychiatry which is a science of medicine and law, in a sense, coming together and interacting. Dr. Franks also worked in a state hospital in Colorado which deals with the criminally insane. For the past decade, Dr. Franks has been deeply involved in Forensic Psychiatry and is a recognized expert in criminal proceedings. Dr. Franks knew of Chief Eagle's deep alcoholic addiction and organic brain damage therefrom. Based upon foundational testimony, these questions were asked of him and these answers were given.

Q. Now, Doctor Franks, based on your examination, do you have an opinion as to what Mr. Chief Eagle's intention was on the evening that he was arrested?

A. Well, my opinion is that his intention was to find a place to sleep that evening when he went into the vehicle.

Q. Do you have an opinion as to what Mr. Chief Eagle's intention was when he was eating the groceries in the car?

A. Well, I think rather clearly he was hungry and the food was there and he ate it.

Perhaps the most critical testimony in the entire trial was by Dr. Franks when he testified: "He certainly was intoxicated that night and at least it seems to me that if he were intent on burglarizing the vehicle he would have taken the food and gone somewhere else to avoid being caught." Testimony establishes that he ate part of a banana, some candy, and left the vehicle with a can of Beanie Weenies and was eating them close by, in the alley, as he was hungry.

Given Chief Eagle's homelessness, and his known habit of sleeping in junked, vacant, or abandoned cars, and given his drinking of 190-proof grain alcohol while using wine as a chaser, and given his history of alcoholic blackouts and organic brain damage, the most critical proof in the case falling upon the Deputy State's Attorney's shoulders was to establish a specific intent to commit a crime when Chief Eagle entered or remained in an unoccupied structure. One easily might say that this was all a question of fact for the jury and blithely sweep it aside; however, the Deputy State's Attorney of Tripp County infused the record with testimony and details of two prior felony convictions and then imbued it with the details of extrinsic evidence of a specific act to supply the intent to commit a crime (petty theft). This latter evidentiary error, which the majority opinion admits exists, turned the tide of battle, in this trial, against Chief Eagle. This extrinsic evidence contributed to the guilty verdict. If it contributes to the verdict, it is not harmless error; rather, it is prejudicial error. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). A man should not be convicted because he is a "bad man"; or, that previously he acted as a "bad man" in a given factual situation for, if convictions were secured in such fashion, the principle that a man may be punished only for those acts

Morgan, Justices, dissenting), I reviewed our state statutes on the definite social stance this state has taken toward alcoholism and intoxication. Alcoholics or intoxicated people per the statutes cited in said dissent, are not to be criminally prosecuted but are to be taken into deten-

tion, via protective custody, and released after becoming sober. We now have "detention centers" throughout South Dakota. If a person has no home, a public treatment facility must assist him in seeking shelter. *See* SDCL 34-20A-62.

with which he was charged, would be violated. Here, an inference of intent rests on the foundation of extrinsic evidence.

Chief Eagle is a very talented artist and sells, from time to time, his drawings and etchings. He drew a beautiful mural in a government building while incarcerated awaiting trial. Diabetes and alcoholism is a scourge for our Red Brothers [2] and, coupled with poverty rampant on reservations, we see it all exemplified in the life of Chief Eagle. Chief Eagle stands at the Bar of Justice—sick—imprisoned—poor—suffering. His plaintive supplication should not go unheeded. He is entitled to a fair trial in the court which our Red Brothers call the "white man's court." [3] A felony conviction, a habitual offender declaration, and a sentence to the South Dakota State Penitentiary for five years strikes me as being a terrible overreaching by the prosecutorial authorities in this case; coupled with the zeal triggering the error found below, which supplied an intent to gain a felony conviction, my sense of justice is aggrieved. I would accordingly reverse this "I want to get in where it's warm" conviction and remand for a new trial.

2. American Indians lose more years of potential life to alcohol-related diseases than blacks or whites, per Centers for Disease Control report, Atlanta, Georgia, August 19, 1985. Alcoholic cirrhosis claimed 527.3 years of potential life for every 100,000 Native American males under 65. *Id.* More than 35% of all Indian deaths in the United States are directly related to alcohol, per Department of Health and Human Services, Public Health Service, U.S. Government report, October 29, 1985. *See* Age Adjusted Diabetes Mellitus Death Rates chart, same government agency, reflecting staggering death toll of Indians dying from diabetes. One in four American Indians under care of Indian Health Service has diabetes, IHS report, Senate Select Committee on Indian Affairs, U.S. Senate, June 5, 1985. Diabetes has reached epidemic proportions on Indian reservations in the United States, per Indian Health Service, Department of Health and Human Services, U.S. Government report.

3. Our system of courts in South Dakota consists of Federal Courts, State Courts, and Tribal Courts. *See Mexican v. Circle Bear*, 370 N.W.2d 737, 742 (S.D.1985) (Henderson, J., concurring in result), for serious jurisdictional question on the power of the state court system or the tribal courts to decide where a deceased Native American will be buried.